IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

```
GARY RITTENHOUSE,              )
                               )
          Plaintiff,           )     8:05CV217
                               )
     v.                        )
                               )
UNITEDHEALTH GROUP LONG TERM   )     MEMORANDUM OPINION
DISABILITY INSURANCE PLAN,     )
                               )
          Defendant.           )
_____)
```

This matter is before the Court on the cross motions for summary judgment filed by plaintiff Gary Rittenhouse ("Rittenhouse") (Filing No. 24) and defendant UnitedHealth Group Long Term Disability Plan ("United Health Plan") (Filing No. 27). Rittenhouse seeks benefits of $10,000 per month under the United Health Plan for his alleged hearing loss (Complaint, ¶¶ VI-VII). Rittenhouse brings this action under the Employment Retirement Security Act of 1974 ("ERISA") § 1132(a)(1)(B). Rittenhouse also seeks his reasonable attorney's fees and costs under ERISA § 1132(g)(1). United Health Plan asserts that its denial of benefits was proper under the definition of disability contained in the insurance policy which insures the United Health Plan (Answer,¶ 17). The Court has reviewed the motions, briefs, evidentiary submissions and the applicable law and makes the following findings.

**I.   Background**

Rittenhouse was employed by National Benefit Resources, Inc. ("NBR") from July 25, 2000, through July 1, 2003, as Vice President of Business Development for North Star, a business unit of NBR (Administrative Record ("AR") 35).  NBR is a subsidiary of UnitedHealth Group ("United Health").  Rittenhouse's job was to manage a profit center with a focus on developing new business opportunities, development of alternate distribution channels for existing NBR products and the acquisition of blocks of business or operating entities (AR 291).  Rittenhouse's written job description included communication as a primary component. Specifically it listed the following requirements:

> Communication.
>
> a.  Listening.  Listens attentively to others, demonstrates full understanding of what others are saying and responds appropriately.
> b.  Feedback.  Asks effective question and gives effective feedback.
> c.  Oral Communication.  Ideas are clearly and concisely expressed in individual and/or group situations.
> d.  Personal Presence.  Maintains a presence which commands attention and respect and shows an air of confidence.
> e.  Meetings.  Written agendas prepared and distributed 2 days prior to meetings of more than 5 people.

AR 292.

In his last twelve months with NBR, Rittenhouse's day-to-day duties changed from the acquisition of new business to the

winding down of the North Star unit.  As an employee of NBR, Rittenhouse was provided with long term disability insurance ("LTD") through the United Health Plan.  The United Health Plan is a welfare benefit plan as defined by and governed by ERISA.  The United Health Plan's summary plan description ("SPD") identifies UnitedHealth Care Services, Inc.[1] as the policy holder and plan administrator (AR 31).  The SPD specifically gives the policyholder "the right to amend or terminate the plan at any time."  (AR 31).  The SPD does not contain any language which confers discretion to the plan administrator in determining benefits or construing plan terms.

The United Health Plan was fully insured under an LTD insurance policy purchased by United Health from AIG Life Insurance Company ("AIG") (AR 2-32).  AIG was responsible for processing disability claims under the Plan.

To be disabled under the terms of the AIG policy, Rittenhouse's condition must "prevent [him] from performing the Essential Functions of [his] Own Job with or without reasonable accommodation and as a result [be] unable to earn more than 80% of [his] Indexed Monthly Income" during the benefit qualification period (AR 11).  During the first twenty-four months of receiving LTD benefits, Rittenhouse's condition had to prevent him "from

---

[1]  The certificate of insurance lists the policyholder as UnitedHealth Group rather than UnitedHealth Care Services, Inc. (AR 2).

performing the Essential Functions of [his] regular occupation or of a reasonable employment option offered to [him] by the Employer" and, as a result be "unable to earn more than 80% of [his] Indexed Monthly Income."  (AR 11).

The policy defined "essential functions" as "functions which are normally required for the performance of an occupation and which cannot be reasonably omitted or modified."  (AR 12). The policy defined "regular occupation" as "the activity that, immediately prior to the injury or the start of the sickness for which you are receiving benefits under the [Policy]:  1. [He] was regularly performing; and 2. Was the source of [his] income from the employer."  (AR 12).

Rittenhouse began to experience hearing problems in the late 1980's.  Since 1993, Rittenhouse has been treated by Dr. Patrick McCarville for progressive hearing loss (AR 39).  Dr. McCarville noted that "by the middle 1990's [Rittenhouse] was really only able to read lips in a large group setting" because of his progressive hearing loss (AR 39).  In 2001, Rittenhouse sought surgical intervention from Dr. Ann Edmonds which was unsuccessful in reversing his hearing loss (AR 39).

In March, 2003, Rittenhouse met with Dr. McCarville who referred him to hearing specialist Dr. Britt Thedinger.  After the referral, but prior to his appointment with Dr. Thedinger, Rittenhouse was notified that his business unit was being closed.

Rittenhouse was examined by Dr. Thedinger on April 30, 2003. Dr. Thedinger determined that Rittenhouse suffered from a bilateral sensorineural hearing loss and opined that Rittenhouse would qualify as totally disabled from his job. On May 30, 2003, Dr. McCarville concurred, agreeing that the hearing loss was very severe and was impacting Rittenhouse's lifestyle and ability to work (AR 207).

During the spring and summer of 2003, while his hearing continued to deteriorate, Rittenhouse oversaw the winding down of the North Star business unit. The North Star business unit closed, and Rittenhouse was laid off, effective July 2, 2003. Rittenhouse's last day of work was July 1, 2003 (AR 285). On that day, he worked until 1:45 p.m. when he left for an appointment with Dr. Thedinger (AR 285).

As of July 1, 2003, Rittenhouse's salary plus bonus averaged $17,692.45 per month (AR 282). Thus, under the terms of the United Health Plan, Rittenhouse would be entitled to the maximum plan benefit of $10,000 per month (AR 282).

After his employment with NBR ended, Rittenhouse had telephone interviews for several positions. During these telephone interviews, Rittenhouse had trouble communicating on the telephone, and no job offers were extended (AR 63).

On October 15, 2003, following the mandated ninety-day waiting period, Rittenhouse submitted a written claim for LTD

-5-

benefits under the United Health Plan to AIG, as claims administrator of the United Health Plan (AR 247).  After its investigation, AIG denied Rittenhouse's claim on April 2, 2004, noting that Dr. Thedinger, one of Rittenhouse's treating physicians, had reviewed an April 30, 2003, audiogram and stated that Rittenhouse "still has excellent speech discrimination in each ear."  (AR 149-51).

On April 9, 2004, Rittenhouse wrote AIG that "hearing tests are conducted in a controlled environment" with "no distracting noise, situations that are not real life in the world as we know it."  (AR 148).  On April 9, 2004, Rittenhouse filed his appeal of AIG's claim denial (AR 148).  With his appeal, Rittenhouse submitted a statement which detailed his inability: to communicate on a regular telephone or cell phone; to understand people in normal conversation unless they spoke more loudly than normal and/or stood close and faced him; to hear high pitched voices or people who speak softly; and to properly function in his occupation of the past twenty-five years which involves spoken communication (AR 143).  Rittenhouse offered to submit to any testing or examination desired by AIG (AR 139-40).  On April 12, 2004, Rittenhouse wrote AIG and specifically suggested "that AIG have a hearing test performed to test my lack of hearing or (sic) understanding the pronunciation of words being spoken in an environment that is not controlled, but at

-6-

normal voice ranges and with background noise which also contribute to my problem."  (AR 139-40).

On August 26, 2004, AIG denied Rittenhouse's appeal (AR 55-59).  AIG informed Rittenhouse that his remaining remedy under ERISA was to file suit.

On September 24, 2004, after his appeal was denied, Rittenhouse underwent a sound-in-noise test at his own expense and submitted these test results to AIG (AR 45-51).  Rittenhouse also submitted a letter from the Chairman of NBR, Joe McErlane, who was Rittenhouse's supervisor, which detailed McErlane's personal knowledge of Rittenhouse's hearing and communication problems which preceded his termination (AR 35).  AIG refused to reconsider its decision or to consider either the sound-in-noise results or the McErlane letter in its determination of disability.

On May 13, 2005, Rittenhouse filed his complaint under ERISA § 502(a)(1)(B) to recover benefits under the United Health Plan (Filing No. 1).

## II.  Legal Analysis

### A.  Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving for summary judgment must always bear "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* NELR 56.1(a).  When the party seeking summary judgment carries its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1996); *see* NELR 56.1(b).

As always at the summary judgment stage, the evidence is viewed in a light most favorable to the nonmoving party, with all inferences drawn in that party's favor.  *See Matsushita Elec. Indus.*, 475 U.S. at 587.  In making this review, the Court is particularly aware that it does not "weigh the evidence and determine the truth of the matter" but instead determines "whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

**B.      Standard of Review**

A denial of benefits challenged under § 502(a)(1)(B) is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115 (1989).  "In other words, unless the plan language specifies otherwise, courts should construe any disputed language 'without deferring to either party's interpretation.'"  *Wallace v. Firestone Tire & Rubber Co.*, 882 F.2d 1327, 1329 (8th Cir. 1989) (*quoting Bruch*, 489 U.S. at 112).  Thus, the Court must examine the benefit plan to determine if the plan gives the administrator or fiduciary discretionary authority.  If the plan does not contain specific language granting discretion to the plan administrator or the claims administrator, then review must be *de novo*.

The Eighth Circuit has stated that "we do not infer discretionary authority when an employer or plan sponsor has funded its obligations under an ERISA plan by purchasing a standard-form group insurance policy.  Rather, we require 'explicit discretion-granting language' in the policy or in other plan documents to trigger the ERISA deferential standard of review."  *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003)(*quoting Bounds v. Bell Atl. Enters. F.L.T.D. Plan*, 32

F.3d 337, 339 (8th Cir. 1994)).  The claim and benefit provisions of a typical insurance policy are insufficient to trigger the deferential ERISA standard of review.  *Ravenscraft v. Hy-Vee Employee Benefit Plan & Trust*, 85 F.3d 398, 402 n.2 (8th Cir. 1996).

An example of "explicit discretion-granting" policy language is found in *Dickson v. A.B. Holding Co.*, 2005 U.S. Dist. LEXIS 26164 (E.D. Mo. 2005).  In *Dickson,* the insurance policy at issue stated:

> For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy.  In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
>
>    determine whether and to what extent employees and beneficiaries are entitled to benefits; and
>
>    construe any disputed or doubtful terms of this policy.

*Dickson*, 2005 U.S. Dist. LEXIS 26164, at *11.

In the present case, the administrative record contains a two-page document titled "Statement of ERISA Rights."  (AR 31-32).  ERISA defines a summary plan description ("SPD") by

detailing what an SPD must contain.[2]  Under ERISA, the "Statement of ERISA Rights" is an SPD because it contains the information mandated by 29 U.S.C. § 1022(b).

The "Statement of ERISA Rights" SPD identifies UnitedHealth Care Services, Inc. as the policy holder and plan administrator (AR 31).  The SPD specifically gives the policyholder "the right to amend or terminate the plan at any time."  (AR 31).  But, the SPD does not contain any language which confers discretion to the plan administrator in determining benefits or construing plan terms.

United Health Plan asserts that while the SPD does not contain discretionary language, the underlying AIG insurance policy does contain language which grants AIG discretion to determine benefit eligibility.  Specifically, United Health Plan directs the Court to policy language under which disability is premised on "**our** determination that a change in your functional

---

[2] Title 29, U.S.C. § 1022(b) mandates that an SPD shall contain the following information:  The name and type of administration of the plan; whether a health insurance issuer (as defined in section 733(b)(2) [29 U.S.C. § 1191b(b)(2)]) is responsible for the financing or administration (including payment of claims) of the plan and (if so) the name and address of such issuer; the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; the name and address of the administrator;  the plan's requirements respecting eligibility for participation and benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis.

capacity to work as a result of your medical condition," where "our" refers to AIG (AR 25(emphasis added)).  United Health Plan also points to policy language addressing when benefits are paid stating that benefits are paid "when **we** determine that proof of your LTD claim is satisfactory," where "we" refers to AIG (AR 21(emphasis added)).

The AIG policy lacks the "explicit discretion-granting" language of *Dickson*.  Instead, the AIG policy language appears to be the "standard-form group insurance policy" language referred to in *McKeehan*, rather than the explicit discretion-granting language necessary to require a heightened standard of review.  Under *Bruch* and *McKeehan*, the appropriate standard of review is *de novo* because the United Health Plan does not contain the explicit discretion-granting language necessary to trigger the ERISA deferential standard of review.  Under a *de novo* standard, the Court will uphold a denial only if it is supported by "evidence bordering on a preponderance."  *Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1177 (8th Cir. 2003).

### III. Discussion

**Additional Evidence**

When the *de novo* standard of review applies, a district court may consider additional evidence beyond that considered by the policy or plan's decisionmaker.  *McKeehan*, 344 F.3d at 793. It is wholly proper to permit the parties to introduce evidence

-12-

relevant to when and whether an insured is disabled. *Weber v. Saint Louis Univ*., 6 F.3d 558, 561 (8th Cir. 1993). The Court will consider the additional information that Rittenhouse's attorney had presented to AIG and which is a part of the administrative record, but which AIG had refused to consider.

United Health Plan has also offered additional evidence, but these two submissions, rather than being a part of the administrative record, were first submitted to the Court and made available to Rittenhouse as submissions with United Health Plan's Brief in Opposition to Plaintiff's Motion for Summary Judgment (Filing No. 37) filed on February 8, 2006.

The first submission is an excerpt from a larger document (Filing No. 37, Ex. B ("Benefits Handbook")). The first page of this submission only contains the words "Benefits Handbook" and "Unitedhealthcare." (Benefits Handbook, p. 1). It appears to be the cover to the benefits handbook for Unitedhealthcare. The remainder of this submission consists of faxed copies of pages 241-252 of a larger document which appears to have been titled "Benefits Handbook - Master Changes." (Benefits Handbook, pp. 2-13).

United Health Plan offers this document as the SPD for the benefit plan apparently in replacement of the SPD which was a part of the administrative record. (AR 31-32). The Court cannot accept this submission as a replacement SPD because it contains

-13-

several inconsistencies which render it unreliable. First, the document represents that it is only part of an SPD and must be "read with the *Administrative Information, Benefit Overview* and *What Happens When* sections" in order to provide the recipient "with the Summary Plan Description (SPD) for United Healthcare's Long-Term Disability Plan." (italics in original)(Benefits Handbook, p. 2). Here the document is not submitted with the *Administrative Information, Benefit Overview* and *What Happens When* sections. Even by its own terms, this document does not constitute an SPD because it is incomplete.

Not only is this submission incomplete, it never references AIG. Any discretion that this excerpt purports to grant is granted to UNUM. UNUM is not a party to this action. Thus, the Court is unable to determine the relevancy of this submission to the present action.

United Health Plan's second, last minute submission is entitled "Integrated Disability Management Agreement." (Filing No. 37, Ex. C). This document purports to be an agreement between United HealthCare Services, Inc. and AIG. This document is unsigned by either party and does not contain any information to evidence that this agreement was implemented. It lacks the reliability necessary to be considered, especially in light of its production at the eleventh hour. Therefore, the Court will not consider either of these submissions.

**Disability Determination**

    **1.  Sound-in-Noise Testing**

After Rittenhouse's appeal was denied, on September 24, 2004, he underwent a sound-in-noise test at his own expense. This test is designed to better evaluate the effect of background noise on a person's ability to hear and understand. This is the type of testing that Rittenhouse had requested of United Health earlier in order to accurately evaluate his condition.

The results of the sound-in-noise test evidence the severity of Rittenhouse's hearing problem. Once testing was done with the presence of background noise, Rittenhouse's difficulty in hearing and understanding vocal communication in an environment that more accurately reflects the conditions of day-to-day life in a business setting is apparent. The test results indicated that, in the presence of background noise that was ten decibels ("dB") louder than the test words spoken, Rittenhouse was only able to correctly identify 48% of what was said to him (AR 51). The ten dB background noise was explained as being quite small when compared to a noisy restaurant.[3] (AR 51). Dr. Roger McGargill, who conducted the sound-in-noise testing, stated that "there is no doubt that the more noise in the situation, the

---

[3] An example of a 10 dB noise has been described as the sound of normal breathing. By comparison a noisy restaurant has been estimated at 85 dB. League for the Hard of Hearing, Noise Center, available at http://www.lhh.org/noise/decibel.htm. Last visited on February 24, 2006.

harder it is to discriminate." (AR 51). Thus, the sound-in-noise testing demonstrates the extent of Rittenhouse's hearing impairment.

In a letter dated November 24, 2004, Dr. Britt Thedinger buttressed the findings of the sound-in-noise testing when he opined that Rittenhouse "will continue to have difficulty hearing even with appropriate amplification especially in background noise." (AR 40).

### 2. McErlane Letter

In addition to the objective sound-in-noise hearing test results, the letter from Rittenhouse's supervisor also evidences that Rittenhouse was having difficulties in communicating on-the-job prior to his termination. Joe McErlane, Rittenhouse's supervisor, detailed his personal knowledge of Rittenhouse's hearing and communication problems which preceded his termination (AR 35). McErlane noted that he had personally observed Rittenhouse's hearing difficulties during staff meetings, employee meetings and in dealing with clients (AR 35). McErlane stated that Rittenhouse's "hearing difficulties were in business settings, face to face, and over the telephone, whether individually or on a conference call." (AR 35). McErlane stated that he personally "witnessed [Rittenhouse], during staff meetings, frequently trying to adjust his hearing aids so that he

-16-

could hear and understand what was being communicated, many times missing important discussion items." (AR 35).

Taken together, the sound-in-noise testing and the McErlane letter evidence that Rittenhouse's hearing was substantially impaired, rendering him unable to effectively communicate as required under his job description.

### 3. Own Occupation

The Eighth Circuit Court of Appeals has held that when a welfare benefit plan uses an individual's own occupation to determine whether he or she is totally disabled, the fact that the individual is able to perform some job duties is insufficient to deny benefits. See Dowdle v. Nat'l Life Ins. Co., 407 F.3d 967, 971-72 (8th Cir. 2005). In the present case, the United Health Plan used Rittenhouse's own occupation to determine whether or not he was disabled during the first twenty-four months of disability. The fact that Rittenhouse worked up until the date his employment was terminated is not dispositive because, under Dowdle, it is clear that a person could be at work, yet unable to perform some of the job duties. Here, Rittenhouse claims that he was unable to fully perform the essential job function of communicating because of his hearing loss. Therefore, the fact Rittenhouse was at work and able to perform some job duties within his own occupation is insufficient

-17-

grounds upon which to deny LTD benefits under the Plan in light of the Eighth Circuit's decision in *Dowdle*.

Furthermore, United Health Plan's assertion -- that the denial of benefits to Rittenhouse is appropriate because he continued to work after his hearing impairment was first detected and that his condition did not significantly change between the time of the diagnosis and the day he quit working and sought benefits -- was rejected in a very recent decision by the Eighth Circuit Court of Appeals. *Seitz v. Metro. Life Ins. Co.*, 433 F.3d 647 (8th Cir. 2006). In *Metro Life*, the Eighth Circuit rejected the same argument United Health Plan is making because there was no dispute that the plaintiff's physical abilities were limited at the time he quit working. *Metro Life*, 433 F.3d at 651. The *Metro Life* court noted that "adopting MetLife's position would unfairly punish individuals who test their limitations and attempt to keep working before seeking benefits." *Id.* Similarly, United Health Plan's position would unfairly punish Rittenhouse for attempting to work until the North Star operations were wound up. Therefore, under the reasoning of both *Dowdle* and *Metro Life,* the fact Rittenhouse worked up until his termination does not support denial of his claim.

The sound-in-noise testing and the McErlane letter demonstrate that Rittenhouse does suffer from significant hearing loss that was effecting his ability to perform one of the

essential duties of his own occupation -- communication.  The Court finds that there is sufficient evidence to support a finding that Rittenhouse was disabled from working in his own occupation under the terms of the AIG insurance policy and the United Health Plan.  The Court will grant plaintiff's motion for summary judgment and deny defendant's motion for summary judgment.

AIG is directed to pay benefits to Rittenhouse for the twenty-four month period, beginning January 1, 2004, under which the LTD policy defined disability based upon Rittenhouse's own occupation.  Rittenhouse is also entitled to pre-judgment interest as provided by law.  *See Metro. Life Ins. Co. v. Novotny*, 400 F. Supp. 2d 1187, 1191 (D. Neb. 2005)(Prejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable).  The Court will also award Rittenhouse attorney's fees and costs incurred in bringing this action.  Rittenhouse is directed to file an application for attorney's fees with the Court.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 28th day of February, 2006.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court